IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | |
|---|---|
| GLENN WILLIAMS,  BROGWLEY RUSSELL, | ) |
| MICHELLE RUSSELL,  RICHARD WILLIAMS, | ) |
| STEVE LIDISLAS, JAMES BURRIS, SHARON BURRIS, | ) |
| KATINA BURRIS, individually and on behalf all | ) |
| others similarly situated, as employees of | ) |
| the  City of Chicago, and  its "sister" agencies | ) |
| (Chicago Park District, Board of Education, etc.), | ) |
| their adult spouses or domestic partners, who | ) |
| were insured under the City of Chicago's Health | ) |
| Insurance Benefit Program at any time between | ) |
| July, 2007, and the filing of this lawsuit and | ) |
| continuing thereafter, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | )   Case No. 20 CV 00420 |
| v. | ) |
| | ) |
| CITY OF CHICAGO, a municipal corporation, | ) |
| Mayor Lori Lightfoot, in her official capacity as | ) |
| the current Mayor of the City of Chicago; | ) |
| | ) |
| TEAMSTERS UNION LOCAL 700 and its current | ) |
| president,  RAMON WILLIAMS, individually, and | ) |
| on behalf of all of the officers and trustees among | ) |
| operating local unions representing employees | ) |
| of the City of Chicago, the individual trustees and | ) |
| officers, individually local unions who represented | ) |
| the plaintiff class during negotiations together | ) |
| with the appointed individuals from among their | ) |
| officers and trustees to represent them as | ) |
| members of the Labor Management Cooperative | ) |
| Committee, (LMCC) Collective Bargaining | ) |
| Agreements effective July 1, 2007 and June 30, | ) |
| 2017 and as represented by their appointed | ) |
| union local Officers and trustees, the "Labor | ) |
| Management Cooperative Committee", and | ) |

**"Jane and John Does", who were designated** )
**by the union locals, including all of the** )
**non-union employees in the negotiations** )
**of their labor management Agreements as** )
**represented by Coalition of Un-unionized Public** )
**Employees ("COUPE");** )
 )
 )
**AMERICAN HEALTHWAYS SERVICES, LLC, a** )
**Hawaiian Corporation and its successors,** )
**Including "HEALTHWAYS SERVICES LLC and TIVITY** )
**HEALTH SERVICES, LLC", Delaware Corporation,** )
**a Foreign Limited Liability Corp;  SHARECARE, INC.,)**
**a group of interrelated sued herein as a group of** )
**interrelated companies as "HEALTHWAYS GROUP")**

## **COMPLAINT**

### **INTRODUCTION**

   This is a class action brought by Glenn Williams and other City of Chicago employees on behalf of all current and former employees of the City of Chicago, as well as their non-employed adult spouses or legally recognized partners. Included are the City's "sister agencies" (e.g. Chicago Police Department, Chicago Fire Department, Chicago Public Schools, and Chicago Park District, etc.), who have been part of eligible participants in the City's employees' health insurance benefit plan as of July 2007. Approximately 35,000 - 45,000 people were required to participate and automatically enrolled in the Chicago Lives Healthy Wellness Program, a wellness program created by the City of Chicago and American Healthways Services, along with the unions to create a program that illegally discriminates against the employees. The venture began with the notice of non-voluntary enrolment in Spring or Summer of 2012. Within a short period thereafter, each employee was then required to submit to a biometric medical screening and examination for all automatically enrolled Wellness Program members.  Subsequently,

additional further mandated tests were instituted that were supported by the threat of additional monetary penalties have been added. In the event the employee and/or their non-employed spouse/partner did not timely complete the Biometric Screening Test and/or other personal health procedures, $25.00 per month was deducted out of the employee's bi-weekly paycheck.  This penalty was also applied if the employee's spouse/partner did not comply with the requirements of the Chicago Lives Healthy Wellness Program.  Therefore, an employee's paycheck could be charged as much as $50.00 per bi-weekly paycheck.  The defendants, including the continued operation of the Chicago Lives Healthy Wellness Program (hereinafter CLHWP), has been a jointly operated, directed enterprise with coordinated activity in the planning, direction, management and operation of all phases of its operation of the enterprise, also known as "Chicago Lives Healthy Wellness Program."

The enterprise has created gigantic economic benefits resulting from the wrongful acquisition and marketing of protected health and personal information at the expense and injury to every plaintiff class member as well as to other unknown but knowable classes of innocent persons throughout the United States.

## JURISDICTION

1.     This action is premised on the following applicable statutes:

    a.  This Honorable Court has original jurisdiction of all civil actions under the Constitution and laws of the United States;

    b.  Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §12117(a), which incorporates by reference Section 706(f)(1) and (3) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§2000e-5(1) and (3);

      c.   The Civil Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. §1964;

      d.   The National Labor Relations Act, 29 U.S.C. §501;

      e.   The Americans with Disabilities Act (ADA), 42 U.S.C. §§ et. seq.; and

      f.   Genetic Information Nondiscrimination Act (GINA), Pub. L. No. 110-233. 122 Stat. Stat. 881.

2.     This Court has federal jurisdiction pursuant to 28 U.S.C. § 1331.

**PLAINTIFF'S EXHAUSTION OF ADMINISTRATIVE REMEDIES**

3.     Plaintiff Glenn Williams has previously filed a timely, individual and class claim on behalf of the same referenced classes in his charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on May 23, 2019 with Chicago District Office, alleging the Chicago Lives Healthy Wellness Program violates the ADA and GINA.

4.     Upon request for certification of the Plaintiff Glenn Williams right to sue in the United States District Court by the Department of Justice, the EEOC transferred the entire filing including exhibits to the appropriate department of the U.S. Attorney's Office in Washington D.C. on June 27, 2019.

5.     On September 25, 2019, the EEOC Chicago Office closed the file for the U.S. Department of Justice to investigate the matter, and on October 21, 2019, the Plaintiff and his attorney's received an electronic communication from the USDOJ of his being granted the right to sue in the U.S. District Court in this matter within 90 days of receipt of the letter. The signed and registered original certification letter, a copy of which is attached herein as ***Exhibit A.***

6.      By filling this federal action within 90 days of Plaintiff receiving the Department of Justice's Right to Sue Letter, Plaintiff has satisfied all administrative prerequisites as required by as a condition precedent to this court's jurisdiction.

## VENUE

7.      The employment practices alleged to be unlawful were committed within the jurisdiction of the United States District Court for the Northern District of Illinois, Eastern Division.

8.      Venue is proper in this District pursuant to 28 U.S.C. §1391e(1) (2012). All plaintiffs, individual and putative similarly situated plaintiffs reside and work or have resided and worked during all relevant times in this District, as well as and the fact that the City of Chicago headquarters and principle place of business are located in this District.

## PARTIES

## PLAINTIFFS

**Glenn Williams, Bradley Russell, Michelle Russell, Richard Williams, Steve Lidislas, James Burris, Sharon and Katina Burris**

9.      Glenn Williams has been a City of Chicago employee for more than 20 years. He has been a member of Teamster Local 700 and its affiliated predecessor Teamster Local prior to the merger in the mid- 1990, and since the beginning of his employment by the City. He is a resident of the City of Chicago. He is single. He has been enrolled in the City of Chicago's employee Health and Hospitalization Insurance plan since he started his employment with the City, including as of July 2012 and up to and including the filing of this lawsuit.

10. Plaintiff, Brogwley Russell, has been employed by the City of Chicago for 15 years. He is a truck driver and a member of Teamster Local 700 since the beginning of employment. He lives with his wife, Michelle Russell, in Chicago. Michelle Russell is not employed by the City. However both Mr. and Mrs. Russell have been enrolled in the City's Hospitalization and Medical Health Insurance Employees Benefit Program throughout Brogwley's employment including in July 2012 up to and including the date of filing this case. Both he and Mrs. Russell were involuntarily enrolled in the Chicago Lives Healthy Wellness Program when it was activated in July 2012. They both involuntarily submitted to the Biometric Screening Test every three years, because of the threatened fines against both of them, as well as the mental anguish of worrying about losing his job if they did not submit. The amount of threatened fine is $25.00 each, per biweekly paychecks, per pay period. For the same reason, the fear of being extorted to pay a total of $1,200.00 in penalties per year, they have since taken the same test several times as well as a second test known as the "Real Age" test since 2017 and every year thereafter.  He was also involuntarily required by the same threatened amount of fines for not timely completing the tests each year thereafter.  He has continued to timely complete the tests each year. On or about 2019, Plaintiff Brogwley Russell obtained a doctor's authorization that would exclude him from the intrusive medical questioning of the CLHWP, and therefore his penalties were no longer deducted from his pay check.

11. The third named plaintiff and relative class representative is Richard Williams. He has been employed by the City of Chicago for approximately 15 years. He is also a truck driver and a member of Teamster Local 700. Mr. Williams, (no relation to Mr. Glenn Williams) lives in Chicago. Mr. Williams, also was automatically and involuntary enrolled in Chicago Lives Healthy

since its inception in the summer of 2012. He also felt anxious about his job security because of the threat of monetary penalties if he didn't comply with the involuntary requirement and the possible loss of his Hospitalization and Medical Insurance Benefits the City provided its employees if he didn't go through with the Biometric Screening test and later the "Real Age" tests.

12.     Plaintiff Richard Williams having completed all the required medical and health procedures and participating in the Wellness Program since 2012, suffered a stroke in April, 2019. His medical care was paid for by his employee benefits City of Chicago Employee Benefit Hospitalization and Medical Program. However, in October 2019, he was called by an employee of Defendant Telligen, on information and belief, a company under the auspices of the Chicago Lives Healthy "Enterprise" (the defendants). Contrary to plaintiff's hospital's medical treaters, the Telligen representatives informed him that he would have to discontinue his outpatient physical therapy at Shirley Ryan's Ability Lab (formally the Chicago Rehabilitation Center) because in reviewing his records there, Telligen (whom he had never had contacted or hired for any purpose) claimed he would not benefit from further professional therapy, and that BlueCross and BlueShield would be ordered not to pay for any further care. Additionally, following his stroke, Mr. Richard Williams' City of Chicago monthly copay  premium for his employee hospitalization and medical group employee insurance has been increased from a range of $200 to $250 per month (he does not have family coverage), to $1,500.00 a month. On information and belief, it appears that the Chicago Lives Healthy Wellness enterprise has upgraded its tortious conduct to that of practicing medicine without a license and/or interfering in the contractual relations of those of medical practitioners and patient.

13.     Plaintiff James Burris is an employee of the City of Chicago electrical department and a member of the Teamsters Local 700 for 34 years.  When the CLHWP was implemented in 2012, he questioned the program and chose not to participate. Consequently, he was penalized $25.00 per pay period (bi-weekly) for his non participation.  In addition, Mr. Burris has also been paying an additional penalty in the amount of $25.00 per bi-weekly paycheck for his wife, Sharon Burris.  This continues to be the case today. At some point during the year 2019, his deductions reduced from $50.00 per paycheck to $25.00 per paycheck without any explanation.[1]

14.     Plaintiff Michelle Russell is the legal spouse of City of Chicago employee and plaintiff, Brogwley Russell.  She is also a named insured on her husband's health benefit policy. As a result, she was threatened by the City Lives Healthy's involuntary wellness program to participate in the CLHWP real age test and biometric testing, that if she did not her husband, Brogwley Russell, would be penalized by the deduction of $25.00 per pay period, regardless if Mr. Russell ad complied with the program or not.  This has been on going by the e since the start of the program in 2012 and continues today.

15.     Plaintiff, Katina Burris, has been an employee of the City of Chicago for the Chicago Public library for 25 years, as well as a unionized ASCME member.  She has not complied with the CLHWP and as a result she has had $25.00 per paycheck was taken out of her pay.  Ms. Burris is a certified disabled employee and has been awarded ADA accommodation in her workplace, and feels the program is too intrusive into her disability and her rights of privacy

---

[1] Because of these types of situations of frequency among a small population, the plaintiffs will seek relief, among other remedies of a court ordered audit of the entire City employee enrolment since 2011

are being violated by the desire for the City to be to know private personal health information which has nothing to do with her position as a librarian.

16.     Plaintiff, Steve Lidislas, has been an employee of the City of Chicago for 27 years and a member of Teamsters Local 700.  He works for the department of transportation as a truck driver.  In 2012, he was automatically enrolled in the CLHWP.  Out of fear of losing money from his paycheck and being further retaliated against or possibly even being fired for not participating, he joined the program.  Approximately two years ago, Mr. Lidislas stopped participating in the program due to privacy concerns, and found the program had no benefit to improving his health.  In addition, his wife, a Chicago Public School teacher, refused to comply with the CLHWP. The Chicago Public School unions refused to be implemented into the enterprise due to the intrusiveness into their employees' privacy.  Even though she was not subject to the involuntary inclusion in the CLHWP as a Chicago public school teacher,  her husband was still penalized for her non-compliance with an additional $25 per paycheck deducted from his paycheck ever pay period.  The deductions for his wife began inn 2012 until 2018 when suddenly the deductions ceased.

**DEFENDANT PARTIES**

17.     Defendant, City of Chicago, is a municipal corporation. It is being sued in its capacity as an employer of the named plaintiffs and putative class plaintiffs. Mayor Lori Lightfoot is sued herein in her official capacity only. On information and belief, Mayor Lightfoot has no personal knowledge or responsibility for any of the ongoing conduct that is alleged herein in so far as the present allegations are concerned.  City officials, Rahm Emanuel, Jamie

Rhee and Amer Ahmad are also named in their individual capacity as principal participants in the implementation, operation and management of the CLHWP.

18.     Defendant, Ramon Williams, is the current President of Teamster Local 700. Local 700 membership is one of 50 or more Union Locals represented within the City and who are employees of the City of Chicago. The union consists of an excess of 1300 individual members. Ramon Williams has been an officer of Local 700 since 2020.  He is sued herein both personally and in his official capacity. As such, he is named as the putativedefendant class representative of all of the elected officers and trustees of all the union locals, members who are employees of the City of Chicago who the elected officials and trustees of Teamsters Local 700 represented in the Collective Bargaining negotiations with the City in the 2007-2008 and 2017-2018. The entire group of which locals were also represented in those negotiations by the designated group of individuals known as the "Labor-Management Cooperative Committee," (hereinafter LMCC) who, on information and belief were appointed 50/50,  12 from labor and 12 by the City.

19.     The identity of the individuals of the Local Unions participating in the 2007-2008 Collective Bargaining Agreement of 2007-2008, effective July 1, 2007 and in the 2017-2018 negotiations and the choice of labor representation on the LMCC is unknown to plaintiffs.

20.      Also represented at the aforesaid collective bargaining negotiations were the non-unionized putative class members as well as unionized putative class members. They too were represented at both City's Collective Bargaining Agreement 2007-2008 and 2017-2018. The American Federation of State, County, and Municipal Employees Council 31 are the name

of one of the un-unionized group representing some of the un-unionized city employees. The other, known as COUPE is the Coalition of Unionized Public Employees.

21. "The Healthways Group" consists of a group of named corporations, all interrelated many of the same offices, directors, shareholders, customers, partners, data products, service, insurance forms and the like. Each one by name served the identical roles as the others but in different years during the period 2012 to the present. The first of the group, for the years 2012 -2014 was American Healthway LLC. Defendants American Healthway Services LLC, a Hawaiian corporation and its successors in interest including Healthways Services LLC, Healthways Inc., Tivity Health Services LLC, a Delaware Corporation, an off shore Limited Liability Corp, American Healthways Inc. and Sharecare LLC, a Delaware LLC, all interrelated corporate entities with ONE or nearly so, changes of name and perhaps some change of investors, some change of principal officer and directors, little change of inventories, data, customers, operations etc. but with contracts with the City of Chicago to act as joint ventures and to do the same work as each of its predecessors in the enterprise i.e. to create, manage, and operate the Wellness Program known as Chicago Lives Healthy during the years 2011- up to and including the filing of the lawsuit and beyond herein after "Healthways", Telligen and Midwest Business.

**BACKGROUND OF EMPLOYEE WELLNESS PROGRAMS**

22. Employee wellness programs have become common in recent years among large employers (those employing more than 200 people) that offer health benefits. These programs engage with many different aspects of employee health care, from questionnaires, to lifestyle

coaching, to smoking cessation classes and programs to reward programs for reaching certain health targets.

23.     As of 2012, a large number of large employers had deployed employee wellness programs that include a health risk assessment, which is typically an extensive medical questionnaire, and biometric testing, such as tests of blood pressure, cholesterol, and blood sugar for both workers and their spouses.[2] Approximately 40 percent of large employers offer incentives to employees that join these programs.[3]

24.     Employee wellness programs are subject to several different legal restrictions, including design requirements and restrictions under the Patient Protection and Affordable Care Act ("ACA"), Pub. L. No. 111-148, 124 Stat. 119.  To the extent that wellness programs solicit confidential medical and genetic information, all of the inquiries or examinations must be "voluntary" under applicable civil rights laws such as the ADA and GINA

**The ADA Requires That Employee Wellness Programs be "Voluntary"**

25.      Historically, the blatant and subtle stigmas attached to those persons with disabilities, along with the disclosure of medical conditions caused inherent harm to those persons with disabilities in the workplace.  The ADA was enacted 1990 to protect individuals with disabilities against workplace discrimination. H.R. Rep. No. 101-485, pt. 2 at 75-76.

26.     Under the ADA, an employer is prohibited from "requir[ing] a medical examination" or "mak[ing] inquiries of an employee as to whether such employee is an

---

[2] Kaiser Family Foundation 2019 Employee Benefits Survey, Section 13: Health and Wellness Programs, http://files.kff.org/attachment/Report-Employer-Health-Benefits-Annual-Survey-2019
[3] *Id*.

individual with a disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity." 24 U.S.C. § 12112(d)(4)(A).

27.     The ADA, however, permits a narrow exception to this general prohibition against non-job related medical examinations and inquiries.  Employers may make medical inquiries and conduct medical examinations as part of an employee wellness program, so long as those inquiries and examinations are "voluntary. *Id*. §12112(d)(4)(B).  Any non-voluntary inquiry or examination is, in itself, an act of discrimination under the ADA. *Id*. § 12112(d)(1).

28.     In 2000. The EEOC promulgated ADA enforcement guidelines providing that "[a] wellness program is 'voluntary' as long as an employer neither requires participation nor penalizes employees who do not participate." *EEOC Enforcement Guidance: Disability-Related Inquiries and Medical Examinations of Employees under the American with Disabilities Act (ADA), General Principles,* Question 22 (July 27, 2000), https:www.eeoc.gov/policy/docs/guidance-inquiries.html#10 ("2000 ADA Guidance").

## GINA'S "VOLUNTARY" REQUIREMENT AND NONDISCLOSURE REQUIREMENT FOR EMPLOYEE WELLNESS PROGRAMS

29.     In 2008, Congress enacted Genetic Information Nondisclosure Act (GINA) to combat workplace discrimination based on the genetic information of an employee or his or her family members.  As Congress emphasized, there is a "compelling public interest in relieving the fear of discrimination and in prohibiting its actual practice in employment and health insurance.: H.R. Rep. No. 110-28, pt. 3, at 2-3.

30.     Under GINA, "genetic information" includes both information about an employee's genetic tests and those of an employee's "family members" and information about

"the manifestation of a disease or disorder in family members". 42 U.S.C. § 2000ff(4). This is accomplished through disclosure family medical history.

31.     To protect employees from discrimination, GINA forbids employers "to request, require, or purchase genetic information with respect to" an employee or his or her family member." *Id*. § 2000ff-1(b).   GINA defines "family members" as dependents under the Employee Retirement Income Security Act of 1974 ("ERISA"), or those related (up to four degrees) to the employee or dependent.  This includes those related through "marriage, birth, or adoption or placement for adoption."    Thus, GINA, protects from disclosure the medical histories of employees and their family members, regardless of whether those family members are blood relatives. This includes the employee's spouse/civil union /domestic partner.

32.      Like the ADA, GINA has a narrow carved-out exception for the collection of genetic information through an employee wellness program.  Under GINA, an employer can request genetic information about an employee or his family members when "health or genetic services are offered by the employer, including such services offered as part of the wellness program," *but* only if, "the employee provides prior, knowing, *voluntary* and written authorization." *Id.* (emphasis added).

33.     In 2010, the EEOC promulgated regulations implementing GINA.  The 2010 GINA Rule forbade employees from penalizing or applying incentives that are conditioned on providing genetic information. 75 Fed. Reg. at 68, 912; 29 C.F.R  § 1635.8(b)(2)(i)(A) (2010).

34.     Thus, the 2010 GINA Rule expressly forbade any penalties/incentives attached to collecting any statutorily-protected genetic information through an employee wellness program, including spousal medical history. 29 C.F.R. § 1635.8(b)(2)(i)(A) (2010).

35.     The GINA regulations also prohibit employers from disclosing genetic information, regardless of how it is collected, with only very limited exceptions, such as consent or court order.  29 C.F.R. § 1635.9.

### C Regulations Governing Employee Wellness Programs under the ADA and GINA Promulgated in 2016

36.     In 2016, the EEOC once again promulgated new regulations governing employee wellness programs' compliance with the ADA and GINA (the "2016 Rules").  EEOC, Amendment to the Regulations Under the American with Disabilities Act, Proposed Rule, 80 Fed. Reg. 21, 659 (Apr. 20, 2015); EEOC Genetic Information Nondiscrimination Act of 2008, Proposed Rule, 80 Fed. Reg. 66, 853 (October 30. 2015).

37.     The 2016 Rules set up a comprehensive framework for addressing wellness program compliance with the ADA and GINA, including protections against using collected information to discriminate, confidentiality instructions, and an explanation of why the ADA's "insurance safe harbor"—a provision excluding underwriting activities from the statute's coverage—does not entirely insulate wellness programs from the ADA's protective ambit.

38.     One of the most significant features of the 2016 Rules was the redefining of voluntary participation in employee wellness programs.  The EEOC abandoned its longstanding position and expressly permitted employers to impose financial penalties for non-participation in a wellness program without rendering the wellness program involuntary.

39.     Specifically, the 2016 ADA Rule established that exams and inquiries in wellness programs were "voluntary" so long as the "incentives available under the program…does not exceed…thirty percent of the total cost of [individual] coverage."  29 C.F.R. § 1630.14(3) (2016). In other words, so long as the financial penalties imposed by the employer did not exceed 30%

of the insurance premium an individual would pay, the financial penalty did not render participation in the program involuntary.

40.     The EEEOC also revised the GINA rules in 2016 on the voluntariness aspect and allowed for the imposition of financial penalties in the context of spousal medical histories. Under the 2016 GINA Rule, employers could penalize employees for refusing to provide spousal medical histories through a health risk assessment in employee wellness programs without rendering the wellness program involuntary, so long as the penalty di not exceed 30% of the total cost of individual health coverage. 29 C.F.R. § 1635.8(b)(2)(iii) (providing that an employer "may offer an inducement to an employee whose spouse provides information about the spouse's manifestation of disease or disorder as a part of a health risk assessment.").

### Court Vacatur of the Penalty and Incentive Provisions of the 2016 EEOC Rules as Arbitrary and Capricious

41.     The penalty and incentive provisions of the 2016 Rules were ruled by the District Court of the District of Columbia as arbitrary and capricious.[4]  The court held that the EEOC had not "considered any factors relevant to the financial and economic impact the rule is likely to have on individuals who will be affected by the rule."[5]  The court specifically noted that the average thirty percent penalty—approximately $1800 per year, is the "equivalent of several months' worth of food for the average family, two months of childcare in most states, and roughly two months' rent."[6]

---

[4] *AARP v. EEOC*, 292 F. Supp. 3d 238, 240 (D.D.C. 2017), *amending judgement at* 267 F. Supp. 3d 14 (D.D.C. 2017)
[5] *Id.*
[6] *Id*. at 32.

42.    On December 20, 2018, consistent with the court's order, the EEOC withdrew the "incentive" portions of the 2016 Rules.[7]

43.    The remaining portions of the 2016 Rules, including the EEOC's "safe harbor" interpretation, remain in effect.  The statutory "voluntary provisions and the agency's prior guidance and regulations, including the 2000 ADA Rule And the 2010 GINA Rule on voluntariness, also remain in place.

## FACTUAL BACKGROUND

44.    During the period of 2004-2008, Mayor Richard Daley and other City of Chicago "Fathers" seriously pursued the idea of landing the 2016 Summer Olympic Games for Chicago. In order to be able to guarantee the selection committee a stable labor market in the City, the City fathers, led by Mayor Richard Daley, engineered an unusually long joint Collective Bargaining Agreement with all of the local unions and un-unionized but represented City of Chicago Employees. The term was from July 1, 2007 to June 30, 2017.

## FACTS CONCERNING THE IMPLEMENTATION AND OPERATION OF THE "CHICAGO LIVES HEALTHY" WELLNESS PROGRAM

45.    The former Mayor of the City of Chicago, Rahm Emanuel, in 2010 campaigned for his mayoralty election. In 2010-2011 his campaign promise, included his promise to cut 20 million dollars per year from the City's cost of its beloved long standing City of Chicago's Employee Medical Insurance Program. At that time, it was enjoyed by the both the approximately 33,000 to 38,000 City Employees, together with the approximately 10,000 to 15,000 employees of its "sister" agencies, including the City's Police departments, the public

---

[7] *AARP v. EEOC,* 2018 U.S.Dist. Lexis 27317  (January18, 2018)

school teachers, the Park District employees together with those of the community college staff. Unfortunately, just the opposite occurred. As a result of the Rahm Emanuel administration, the City's employees have since incurred a tremendous intrusion into their civil and legal rights. In addition, the City's debt has substantially increased along with the amount of taxes Chicago residents pay.

46.     On April 12, 2012 Mayor Rahm Emanuel publicly announced the introduction of the new employees wellness program. See **Exhibit B.**

47.     The Mayor's office subsequently released a press release July 27, 2012. This release stated that "the Wellness Plan, developed between organized labor and the Mayor's Office through the LMCC will go a long way toward giving employees control of their health, giving them greater access to comprehensive and preventative care and helping contain out of pocket expenses while saving the City and tax payers money" Ramirez said. See **Exhibit C.**

48.     The same release from the Office of the Mayor, includes the fact that the City's Wellness Program, a private sector, private wellness program, was designed, managed, and operated by the global well-being leader, Healthways.

49.     The July 27, 2012 release also announced that the City had entered in a four year contract with Healthways (American Healthways Services LLC, of Franklin, TN). The contract was for the amount of 24 million dollars, for the approximately 7,000 eligible City workers for the purpose of managing the new Wellness Program. Healthways, founded in 1981 had reported 720.3 million dollars of revenue for 2010.

50.     The statistics available from the City demonstrates that approximately 85% of the employees and spouses who has enrolled in the program, allegedly do to the threat of monetary penalties pursing his enrolled status in CLHWP. See **Exhibit D**.

51.     During the course of the 8 years the program has been in operation, approximately 4,000 employees have opted out of the program each year. See **Exhibit** D, infra. As a result of opting out of the program, these employees have been penalized in amounts ranging from $600 to $1,200 per year.  Those employees who have been coerced to join the program due to the threat of monetary penalties, approximately 35,000 have had their personal health information (PHI) shared with numerous companies without their knowledge or consent.

52.      In addition, as of 2019, employees enrolled in the CLHWP, are screened through the "Real Age Test" along with biometric screening, and the results of these involuntary tests indicates whether the employee and/or their spouse are forced into the "Health Improvement Program", (hereinafter "HIP").  The HIP program is designed for those employees whose result show that they individual at high risk for certain diseases such as, COPD, heart disease, and diabetes. The HIP requires further testing and intrusive participation in the program. Those employees who are required to join HIP are disclosed to their employer, the City of Chicago.

53.     The City's Office of the Inspector General issued an advisory report in June 2015 that stated as follows in regard to the Chicago Lives Healthy Wellness Program:

> "The City encourages CLH participation by assessing a $50 month surcharge to the employee healthcare contribution of those who decline to enroll.  As of March 6, 2015, nearly 85% of benefits-eligible City employees, spouses, and domestic partners (23, 130 of 27, 339) elected to participate in CLH for FY2015 since implementing CLH, the City has collected $1.9 million in non-participation surcharges."   See **Exhibit F.**

54. Plaintiffs were therefore driven to participate in the CLHWP by threats of monetary fines and fears of discrimination and further retaliatory and adverse employment actions. The Enterprise Program as it has been referred to by defendant in all their contractual greements have used this threat of monetary fines to increase participation.

**THE UNIONS INVOLVEMENT OF THE UNIONS IN THE IMPLEMENTATION OF CHICAGO LIVES HEALTHY WELLNESS PROGRAM**

55. In 2012, the City, in partnership with many of its collective bargaining representatives, through its Labor Management Cooperation Committee (LMCC), launched a Wellness Program to engage and educate its workforce to identify, prevent, and manage chronic conditions and other health concerns with the goal of increasing overall health and reducing healthcare cost. The LMCC is a joint management and labor committee established under section 302(c)(9) of the Labor Management Relations Act of 1947 (LMRA), as amended, 29 U.S.C. § 186(c)(9). The LMCC was formed by the City and its labor organizations to permit health and employee benefit matters to be revised outside of regularly scheduled collective bargaining periods; the Wellness Program is one of the programs jointly managed by the LMCC.

56. There is absolutely no evidence of any member or officer of any union of any elected official at any tie between 2007 and 2020 have questioned the Defendants legality the costs to the City, the invasion of privacy and protected medical rights and information, the terms of the contract of the City and Healthways. In fact, the members complained with no avail, and the trustees of each trust got paid and there is no accounting.

ADD page 2 of RFP labor unions and LCC see tab***********

**MANDATORY EXAMINATIONS, BURDENSOME HEALTH COACHING, AND REPORTING REQUIRED TO COMPLY WITH THE CLH**

57.     Second, the City's WP illegally imposes "Biometric Screening" and "Real Age" testing procedures on all of its involuntary enrolled members. Again retaliation is threatened and penalties are imposed upon those employees or their adult spouses who choose not participate in such procedures. T. The penalty, $25.00 per non-participating individual and, is deducted from the employees bi-weekly paychecks.  Refer to Exhibits 12a, 13, 14, 15, 17, 18, 20, 21, 26, 28, 29, 30, 31,

58.     Most recently, as of 2019, defendants have imposed an additional invasion into the Civil Rights of the City of Chicago's employees and family members. The Defendants have charged into a new form of privacy invasion, "The Real Age Test" as referred to by the Finance Department as available to schedule the test by calling 1-866-556-7671. See Exhibits___

59.     The testing required under the City of Chicago's Wellness Program includes medical examinations within the meaning of the ADA because the required testing is administered by a health care professional or in a medical setting and seeks information about an individual's physical or mental impairment or health. The testing requires blood draws and cholesterol testing.

**CAUSES OF ACTIONS**

**COUNT 1– VIOLATIONS OF THE ADA,  U.S.C. § 12112(d)(4)(A) and (B)**

60.     Named representative plaintiffs, individually and on behalf of the putative class and persons similarly situated they represent that the defendants, one or more of such, acting or failing to act have proximately or directly caused injury to each of the named plaintiffs and the putative class of persons similarly situated persons.

61.     Plaintiffs incorporate all well pleaded prior paragraphs 1 through 62 as though pleaded as paragraphs 1 through 63 of this Count I.

62.     Defendants are covered entities under 42 U.S.C. § 12111(2) and § 12111(5)(A) because they are either an employer, labor union, or agent thereof, engaged in an industry affecting commerce with 15 or more employees.

63.     The ADA requires that employee wellness programs must be voluntary. 42 U.S.C. § 12112(d)(4)(A) and (B). Defendants are in violation of the ADA in that they require medical examinations and make personal health inquiries of employees, along with their spouses in violation of 42 U.S.C. §12112(d)(4)(A) and (B) because the medical examinations required under the CLHWP are not ""voluntary" components of an employee wellness program. Such examinations are not voluntary in that they penalize employees who do not participate, disclose the employee's disabilities or potential disabilities, and are not in relation to job functions or a business necessity. They are illegal examinations.

64.     The testing required by the Defendants in the management and operation of the Defendants' CLHWP wellness program is a medical examination within the meaning of the ADA because the testing is administered by licensed healthcare professionals, and/or in a medical setting, and seeks information about an individual's physical or mental impairment or other PHI. The testing requires biometric screenings (which include blood draws, cholesterol testing, and tri-glyceride, etc.), disclosure of PHI.  All of the information illegally obtained and disclosed to agents of Sharecare through the violations of federal ADA laws.

65.     Defendants, through the imposition of the Chicago Lives Healthy Wellness Program, automatically enroll City of Chicago employees (and/or spouses and legally qualified

civil unions). If the employee or their spouse takes an affirmative action to "opt out" of the program, or does not complete biometric screenings or testing, the City of Chicago imposes penalties for noncompliance. Penalties are provided for involuntary behavior and are illegal because involuntary medical exams, tests, procedures and/or any other inquiry that is designed to disclose protected medical or personal information is illegal. CITE ADA FED PRIVACY ACTS.

66.     The CLHWP is illegal in that it penalizes those employees who choose to opt out or fail to submit or complete testing as a requirement of the wellness program or coerces the employees to join based on the fear of economic harm of the penalties that will be placed upon them if they do not enroll.

67.     The Health Improvement Program is a segregation of persons who unfortunately have afflictions considered to be high risk medical care and expense individuals. As compared with non-HIP participants, the B group (See Exhibit ___), the HIP group, A Group, with the threat of penalty and monetary fines on a monthly basis are required to participate in further testing and in a considerably more rigorous health improvement program than all other employees otherwise similarly situated. In addition, the identification of all of those persons as well as identification of all other persons participating in the wellness program since its inception in 2012 together with all of the medical information previously collected by the Enterprise participants, whether copied and marketed to third parties or otherwise is readily made available to the employer, the City of Chicago. This is classic discrimination as to all class members in violation of ADA as well as common law privacy rights.

68.     At all times herein, the defendant contracted with one another and jointly operated and managed the CLHWP. The City of Chicago ensured enrollment by coercing and

extorting monetary penalties for noncompliance or opting out of the program. Sharecare and Telligen both over saw the program, Healthways (Sharecare) designed the program, alerted the city of those employees they needed to penalize, and forced the employees to agree to their privacy policy, released the information about the results to City to further discriminate against those employees that were high risk for contracting certain diseases, and that have higher than normal insurance claims. and made medical assessment that further discriminated the employees of the City of Chicago, and shared their personal health information with third parties and the City of Chicago.

69.    The City maintains access to all of the medical and personal date who has participated in CLHWP and HIP.

70.    The defendants' acts were an intentional, premeditated and conspiratorial so as to create a subterfuge in order to disguise and permit the illegal obtaining and conversion of both protected personal health information and protected private information for the purposes of marketing such information and creating a money making machine in the guise of an employer wellness program by subjecting and coercing employees to provide their protected personal and privacy rights and in a manner so as to avoid criminal prosecution.

71.    Defendants' rights described above were done with malice or reckless disregard of Glenn Williams and the class members he represents' federally protected rights.

**COUNT 2– VIOLATIONS OF THE ADA, TITLE V, §503(A), 42 U.S.C. § 12203(A)**

72.    Named representative plaintiffs, individually and on behalf of the putative class and persons similarly situated they represent that the defendants, one or more of such, acting

or failing to act have proximately or directly caused injury to each of the named plaintiffs and the putative class of persons similarly situated persons.

73.     Paragraphs above are realleged and incorporated by way of reference.

74.     The City of Chicago retaliated against Williams and the class members he represents because of deducting twenty-five (25) U.S. Dollars from each bi-weekly paycheck if they made a good faith effort decision not to participate in the City of Chicago's Wellness Program in violation of Title V, §503(a), 42 U.S.C. § 12203(a).

75.     The effect of the practices complained of above, have been to deprive Williams, et al of equal employment opportunities and otherwise adversely affect their status as an employee because they opposed matter made unlawful by the statue and objected to be subjected to unlawful medical examinations and inquiries.

76.     The Defendants' acts were intentional.

## COUNT 3 -VIOLATION OF GINA AS TO PLAINTIFFS AND PUTATIVE CLASS AND PUTATIVE SUBCLASS PLAINTIFFS

77.     Named representative plaintiffs, individually and on behalf of the putative class and persons similarly situated they represent that the defendants, one or more of such, acting or failing to act have proximately or directly caused injury to each of the named plaintiffs and the putative class of persons similarly situated persons.

78.     Plaintiffs incorporate by reference all preceding allegations in this Complaint as if fully pleaded in this Count.

79.     Defendants, through the implementation of the City of Chicago's  employee wellness program (CLHWP) violates Title II of the Genetic Information Nondiscrimination Act, 42

U.S.C. § 2000ff-1(b), by requesting, requiring, or purchasing genetic information with respect to an employee or family member of the employee of the City of Chicago without voluntary authorization from the employee and/or their spouse.

80.     The definition  of "genetic information" under GINA includes information about the manifestation of disease in a family member. 29 C.F.R. §1635.3(c)(iii).

81.     In addition, Under GINA, it is also unlawful for a person "to discriminate against any individual because such individual has opposed any act or practice made unlawful by" the act. 42 U.S.C. § 2000ff-6(f). Defendants retaliated against those plaintiffs who did not enroll or participate in the CLWP what she perceived to be a GINA violation.

82.     Under GINA, a spouse is defined as a "family member," a dependent under ERISA, or those related (up to four degrees) to the employee or dependent. ERISA permits individuals to claim dependents "through marriage, birth, adoption, or placement for adoption." This includes spouses. Thus, protected health information relating to manifested conditions of spouses is the employee's family medical history, which is "genetic information" under GINA. 29 C.F.R. § 1635.3(a)(1).

83.     Through the Defendants CLHWP, which includes blood samples and involuntary disclosure of  history of medical diseases, Defendants are given access to both the employee of the City of Chicago, as well their spouse's (if the spouse is covered under the City em0ployee's health benefit plan), medical history considered for the purpose of a manifestation of diseases or potential diseases. Such information falls within "genetic information" with respect to an employee or spouse of the employee without voluntary authorization from the employee, and therefore Defendants' are violating GINA laws.

84.     The CLHWP's testing requirement for spouses, which includes the City's agents' obtaining test results to analyze them for risk factors, is a request for genetic information because it elicits information about the manifestation of a disease or disorder in the employees' family members.  29 C.F.R. §1635.3.

85.     Further, as a requirement for enrolling in the CLHWP, plaintiffs who comply with the wellness program must disclose their health insurance policy numbers to the Defendants, which allows for disclosure of insurance claims data about employees and their spouses from their insurance provider, Blue Cross and Blue Shield, to the wellness vendors that the City have contracted with (Healthway, Sharecare, Telligen and TCYOH), therefore unknowingly disclosed to the CLHWP enterprise. This is an unlawful disclosures of genetic information under 29 U.S.C. § 1635.9.

86.     The CLHWP's exposure to all of the plaintiff's medical insurance claims data, along with PHI that the plaintiff provides to defendants (Sharecare and Telligen) as well as from insurance providers through the City's agents are requests for genetic information because they elicit information about the manifestation of a disease or disorder in the employees and their non-employee spouses.

87.     The Defendants' transfer, through its agents, of insurance claim data about employees' spouses from insurance providers to wellness vendors and from Sharecare to/or from Telligen and/or TCOYH are unlawful disclosures of genetic information under 29 U.S.C. §1635.9.

88.     The services offered by the CLWP is not knowing *voluntary*, and written authorization and in violation of 42 U.S.C. §2000ff-1(b) (2012).

89.     In connection with the CLHWP, the defendants unlawfully disclosed Plaintiffs' spouses who were enrolled in the CLHWP's genetic information. 29 C.F.R. § 1635.9.

**FACTUAL ALLEGATIONS COMMON TO ALL RICO COUNTS**

90.     Section 1964(c) identifies four factors that a plaintiff must establish to have standing to bring a civil RICO claim:  (1) the plaintiff must be a "person" (2) who sustains injury (3) to its "business or property" (4) "by reason of" the defendant's violation of Section 1962.1.

91.     Plaintiffs are all natural persons.  All Plaintiffs have sustained injuries as described above, to their property.  For the employees, such as Glenn Williams, James Burris, Sharon Burris, Steven Lidislas and Katina Burris, they all did not comply with the enterprises "wellness program," and were all penalized  with an ascertainable, financial property loss, the minimum loss of $25.00 per paycheck, . For other putative subclass plaintiffs, those such as Brogwley and Michelle Russel, who are employees who complied with the involuntary medical examinations, lost their protected property of their health information and records and privacy, as personal private information's, and all injuries are a direct and proximate cause of the defendants violations of federal health laws, and/or extortion, as well as the intentional breach of contracts and fiduciary duties owed to them by the Labor Unions, and other defendants.

92.     To state a claim under § 1962(c), Plaintiffs must allege: (1) conduct; (2) of an enterprise; (3) through a pattern; (4) of racketeering activity. *Richmond v. Nationwide Cassel L.P.,* 52 F.3d 640, 644 (7th Cir. 1995) (quoting *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496 (1985)).

**The Enterprise**

93.     Defendants are an enterprise who engages in and whose activities affect interstate commerce.   All defendants have entered into contract for the operation and management of the CLHWP. See EX_____ .

94.     The Enterprise consists of the City of Chicago, Healthways (aka"Sharecare"), and the Local Unions (LMCC) who entered into the collective bargaining agreements with the City of Chicago beginning in 2012.  The said agreement jointly along, with the LMCC, entered into agreements to collectively work together to provide marketing and sharing of personal health information, advertising, letters, documents, combining space, facilities, moneys, constituting an entire integration.  Healthways (Sharecare), contracted with the City to design, manage and operate the CLHWP. Through the enrollment forms online that an employee must use to sign up for the tests, the employee must agree to Sharecare's privacy policy (which explicitly states the complete disclosure of all information, including but not limited to PHI, and allows all personal information to be shared and marketed by Sharecare. The City pays Sharecare for the implementation of this program, they are all working collectively to further the illegal activities of this program.  They program, through the agreements and documents from the City of Chicago and Sharecare and the LMCC even hold themselves out to the program as an "Enterprise" program. See EX_____ .

95.     The relationship is one that holds itself out to be an "enterprise".   See exhibits…..In addition, defendant Sharecare include the City of Chicago under their insurance and indemnification clauses. They entered in to multiple agreements with one another, had interpersonal relationships with a common interest.

96.     The RICO enterprise is an association-in-fact enterprise, pursuant to 18 U.S.C. §1961(4), consisting of all defendants.

97.     This enterprise has a common purpose: to sell and market personal health information for a profit. This is accomplished by coercing employees of the City of Chicago, to join the CLHWP by threatening a minimum of $50.00 per month payroll deduction from the City employee, and doubling that amount, if they are legally married and the employee or his/her spouse refuse to surrender their federally protected health, personal and private information.

98.     The Sharecare privacy agreement, posted publicly on their website at the internet address of: http://sharecare.com/static/privacypolicy, states how Sharecare shares the PHI of anyone who uses their services.  Most concerning is that by agreeing to use the Sharecare platform, Sharecare pledges to not sell the users PHI to a third party, but states it may "disclose your PHI to our business associates, who perform various functions on our behalf, but Sharecare requires these third parties to agree in writing to safeguard your PHI appropriately in accordance with the law." It gets better. The next sentence states: "Sharecare does not sell or rent your PHI to third parties.  Sharecare does not use your PHI to market, sell, or otherwise promote goods or services that are NOT (emphasis added) health-related benefits provides by your health plan, employer, or provider."  See Privacy policy p 2. According to ***source** Sharecare's business associates include Colgate….

99.     The next statement in the privacy policy, which is involuntarily done through the Enterprises' actions that the user must agree to allow Sharecare to share their PHI with their "business associates.  See privacy policy***p.2*** (including but not limited to corporate conglomerates Phizer, Colgate-Palmolive, Walgreens,   under the title, "increased health care

contributions" However, every named plaintiff in this case who has had the monetary penalties deducted from their paycheck, have never seen any change in the amount of the health insurance premiums that they pay to Blue Cross and Blue Shield for their insurance premiums. No one has ever been able to tell any of the plaintiffs as to where the money is actually going. The involuntary wellness program has been in place since 2012 and the employee must either renew their CLHWP enrollment each year, submit to medical examinations every ear (biometric screening every 3-4 years), or take the penalties associated with noncompliance. The contracts and economic disclosures are regularly submitted showing there is regular communication among the Enterprisers.

100.    This relationship has been ongoing since April 12, 2012, however the alleged injury by the plaintiffs was not discovered until 2017, and continues through the filing of this complaint.  However, on information and belief, the enterprise could have been created prior to this time, as early as 2007.

101.    Sharecare's privacy policy specifically hold defenas **M as an enterprise program see privacy policy**************

**A.  CONDUCT**

102.    At all times herein, the defendant contracted with one another and jointly operated and managed the CLHWP.  The City of Chicago ensured enrollment by coercing and extorting monetary penalties for noncompliance or opting out of the program. Sharecare and Telligen both over saw the program, Healtways (Sharecare) designed the program, alerted the city of those employees they needed to penalize, and forced the employees to agree to their privacy policy, released the information about the results to City to further discriminate against

those employees that were high risk for contracting certain diseases, and that have higher than normal insurance claims and made medical assessment that further discriminated the employees of the City of Chicago, and shared their personal health information with third parties and the City of Chicago.

103.     In addition, Defendant, Sharecare, in their contract with the City of Chicago, adds the City to their insurance policy, and the indemnities??

B. **PATTERN**

104.     The Defendants acted throughout the term ongoing term the Enterprise in a pattern based on, including but not limited to, the bi-weekly extortion of money from an employee's paycheck for not complying with the program, the coercion with the threat of retaliation all employees, resulting in the employees joining this Enterprise program, the continuous illegal annual enrollment procedures, enrollment documentation, enrollment dates, testing facilities, maintenance of common testing facilities for the most part, personnel, accounting procedures, collection procedures, advertising material, enforcement procedures, data collection, activities, programs , accounting procedures, in short, collectively since 2012 until the time of the filing of this lawsuit and the continuing time thereafter.

C.  **RACKETEERING ACTIVITY**

105.     Defendants have violated 18 U.S.C. §1962(c), which states, in pertinent part:

"It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affair through a pattern of racketeering activity.

Has committed a pattern of repeated violations of §§1956 and 1958."

106.    Defendants have engaged in and continue to engage in violations of 18 U.S.C §1956(c)(7)(F) in violation of a Federal Health Care Act.  Such acts committed are the ongoing violations of HIPPA and the non-authorized disclosure of PHI.

107.    As a direct and proximate cause of the City of Chicago's pattern of racketeering, all plaintiffs have been damaged either by the extortion of monetary penalties, by the enterprise and/or the violations of their personal health privacy laws.

108.    Each defendant individually engaged in the predicate acts of racketeering.  The City of Chicago coerced its employees to joining an illegal involuntary wellness from by either the actual or threat of financial losses if they did not join the program.  Rahm Emmanuel, with the motive to become the elected Mayor of Chicago in 2010, began the process of incorporating the enterprise and engaged into the initial contract with Healthways in 2012 as a way to keep his campaign promise to cut healthcare costs down for the City. Jamie Rhee, along with the chief procurement officer and comptroller of the City of Chicago, also signed the initial contract as a way to support Emmanuel's enterprise.  Sharecare designed the program, and sought and received  financial gain through the implementation of the enterprise program, and the teamsters, along with the other unions, all individually breached the fiduciary duties of their union members by allowing for the breach of the collective bargaining agreements in order to further the illegal enterprises goal.

### COUNT 4 -CIVIL RICO FOR VIOLATING 18 U.S.C. §1962

109.    Named representative plaintiffs, individually and on behalf of the putative class and persons similarly situated they represent that the defendants, one or more of such, acting

or failing to act have proximately or directly caused injury to each of the named plaintiffs and the putative class of persons similarly situated persons.

110. The preceding paragraphs are incorporated herein as though fully set forth below.

111. All defendants are RICO persons pursuant to § 1961(3) as they hold legal and or beneficial interest in property. The City of Chicago is being sued in the capacity of an employer, and not as municipality. In addition, Rahm Emmanuel, Jamie Rhee, Comptroller and Edward Burke are additionally named in this complaint in their individual capacity.

112. They are also conspirators of an enterprise to further operate and manage the racketeering activity, but, besides the "Healthways Group (i.e. American Healthways, Healthways, Inc., Sharecare are all defendants have separate business besides the enterprise program.

113. Defendants have committed a pattern of repeated violations of §§ 1951 and 1956(c)(7)(F), and 880 for the past four years, and longer which are "acts of racketeering pursuant to 18 U.S.C. §§ 1961(1)(B) and (C).

114. All Defendants have created an enterprise (CLHWP) engaged in and whose activities affect interstate commerce. Defendants are associated with the enterprise.

115. The Defendants agreed to and did conduct and participate in the conduct of the enterprises' affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally coercing plaintiffs to further an illegal Federal Health care violation.

116. Defendants each individually contracted with one another knowingly violated federal law to coerce the employees of the City of Chicago to divulge their PHI information to

Sharecare and its associates for the common purpose of creating an illegal enterprise and violating federal health and employment and discrimination laws.

117.    Pursuant to and In furtherance of their fraudulent scheme, Defendants, for a period of eight years, continuously committed multiple related acts of coercion, extortion and violations of federal Health laws, and penalizing those employees and spouses set forth above constitutes a pattern of racketeering activity pursuant to 18 U.S.C. §1961(5).

118.    The relationships and racketeering activity continues today.

119.    All Defendants acting as a conspiracy to engage in illegal activity (violations of the ADA, GINA), including nonvoluntary, automatic enrolment of all employees and their spouses of the City of Chicago, by automatically enrolling all City employees and their spouse domestic partner/civil union partner of a City employee who are covered as defendant in a City medical plan as of November 1, of the previous year into their Chicago Lives Healthy Wellness Program.  They are automatically enrolled and are threatened by the imposition of  financial penalties on those individuals and their covered spouses who take an affirmative step of "opting out" of the wellness programs, or do not timely complete the required medical screenings.

120.    Such activity is in violation of the Civil Rights Acts, including America with Disabilities Act, GINA, and illegal, discriminatory.   It also falls under the definition of "Racketeering" under 18 U.S.C. §1962.

121.    As a direct and proximate cause of the enterprise's pattern of racketeering, the employees of Chicago have been injured in the following ways:

a. Plaintiffs have been injured in their property in that they have had money deducted (The monetary penalties amount to $660 per year for a single individual for an unexcused failure to participate in the certain test, including "medical test" including invasive blood testing and other biometric screening activities and medical information disclosure test called "Real Age Test." This doubles if their spouse also does not participate.) out of their paycheck for either non-compliance with illegal employment actions;

b. Employees who do participate in the CLHWP have lost their property in the form of their personal health data, their PHI is divulged to unknown entities ("business associates" and "sponsors" of Sharecare); See EX_____(SC PRIVACY POLICY).

c. They have suffered discrimination through their employment of the City of Chicago by the information that was acquired by their employer that is not job-related and illegally obtained.

d. With Approximately 4,900 individuals since 2012 paying $600 per year in penalties to the City of Chicago for non-compliance with the CLHWP, collectively, the amount of damages these individuals have accumulated through 2019, are approximately $20.5 million dollars.

122.    Those such acts at all times herein were intentional and the funds remain unaccounted for.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment against the defendants, for their damages, trebled, plus attorney's fees, costs and pre-judgment interest.

Plaintiffs also ask for preliminary and permanent injunctions prohibiting Defendants from continuing with the CLHWP.

    A.   Plaintiffs request a jury trial.

    B.   Plaintiffs request certification of the case as a class action.

### COUNT 5 - CLAIM AGAINST THE CITY OF CHICAGO FOR VIOLATING 18 U.S.C.1962(d)

123.    Named representative plaintiffs, individually and on behalf of the putative class and persons similarly situated they represent that the defendants, one or more of such, acting or failing to act have proximately or directly caused injury to each of the named plaintiffs and the putative class of persons similarly situated persons.

124.    The preceding paragraphs are incorporated herein as though fully set forth below. 64. In carrying out the RICO violations, the City formed an agreement with the unions to carry out the objectives described above.

125.    This agreement has been ongoing between these entities for at least the last four years, and likely, longer.

126.    18 U.S.C §1962(d) states, in pertinent part: "It shall be unlawful for any person to conspire to violate subsection(c) of this section." (internal punctuation omitted).

127.    Therefore, this is an agreement to violate §1962(c), which violates 18 U.S.C. §1962(d).

128.    As a direct and proximate cause of City's conspiracy to violate §1962(c), Plaintiff has been injured in its business and property, pursuant to 18 U.S.C. §1964(c), as detailed above.

ACCORDINGLY, WILLIAMS demands judgment be entered against , pursuant to 18 U.S.C. §1964(c), for its damages, trebled, plus attorney's fees, costs and pre-judgment interest.

WILLIAMS also seeks preliminary and permanent injunctions against the City from continuing to enforce the union-only policy.

A.  WILLIAMS requests a jury trial.

B.  WILLIAMS requests certification of the case as a class action.

### COUNT 6 - VIOLATION OF FIDUCIARY RESPONSIBILITY OF OFFICERS OF LABOR ORGANIZATIONS, 29 U.S.C. 501 (LMRDA)

129.    That the preceding paragraphs are incorporated herein as though fully set forth below.

130.    That the Labor Organizations named in this action had a fiduciary duty to its members.

131.    That plaintiff, GLENN WILLIAMS, at all times herein, was a member of Local 700.

132.    That at all times herein, MICCHAEL MALONE, was the elected officer of LOCAL 700.

133.    That at all times herein, the officers of Local 700 held a position of trust and required to act in the best interest of their union.

134.    That defendant MICHAEL MALONE, individually, and as an elected officer of LOCAL 700, together with the putative class of union officers and representatives that he has been named a representative of, at all times herein, owed a fiduciary duties to its members, including that of the plaintiff , to act in a duty that is in the best interest to the plaintiff

135.    In that they violated that fiduciary duty by agreeing to, sponsoring, cooperating, participating and promoting the City of Chicago's discriminatory practices by the implementation of the CLH wellness program.

136.    That GLENN WILLIAMS sought remedial action through the union, and the officers of Local 700, and the union has refused remedial action.

137.    The officers of Local 700 first breached their fiduciary duties to its members when it agreed to the side letter that affected the rights of the plaintiff and putative class members to their health care benefits and imposition of discriminatory practices and continue to do so by actively participating in the illegalities of the CLHWP enrollment requirements as well as the extortionary conduct together with the other defendants that there was an ongoing breach of the fiduciary duties of elected officer and trustees of Teamsters Local 700, the LMCC members who are the defendant class represented Michael Malone or who the defendant class officers trustees of the putative classis ultimately certified by this court.

**COUNT VII**

**ACCOUNTING**

138.    Request for accounting of Penalty Funds represented plaintiffs respectfully request that for the following reasons that the Court grant plaintiffs' request for an accounting of the funds previously deducted from the bi-weekly paychecks.

139.    Mr. Glenn Williams is and has the amount of $25.00 deducted from his paycheck every pay period since July 2016.  He has inquired both on via electronic mail and with the head of the City of Chicago's benefit office in charge of the wellness program, Ms. ***.  She informed him that she has no idea how the City accounts for these funds or who is involved in maintaining the records.

140.     Plaintiff, GLENN WILLIAMS, together with his counsel have spent several hours attempting To use the internet and the City's website, but there is no information available as to the whereabouts of the funds deducted from their paychecks.

141.     Plaintiffs have no means to determine the amounts and the whereabouts, or the persons who may have claim to such funds, and have exhausted any means of doing so.

142.     The amounts collected by the City of Chicago have never been accounted for and the premiums of the plaintiffs made towards their health insurance premiums remained the same, and were never increased nor decreased.  The amounts the city has gained over these years cumulatively are over the amount of $10 million.

143.     That the City of Chicago owes its employees, individually and as putative class members the fiduciary duty to account for their allegedly wrongfully collected funds.

WHEREFORE, plaintiff GLENN WILLIAMS respectfully requests this Honorable Court to order the City to account for the funds allegedly taken from said parties.

## CLASS ACTION ALLEGATIONS

144.     Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) on behalf of all current and former City of Chicago employees who are or were required to participate in the HEP or pay a $25 weekly fine between January 1, 2017 and present, including a sub-class of these employees whose spouses are or were required to participate in the HEP or pay the same fine during that time period. Plaintiffs seek declaratory and injunctive relief, lost wages, and non-economic damages.

145.    Certification under Rule 23(b)(2) is appropriate because Yale has acted or refused to act on grounds that apply generally to the class and final injunctive or declaratory relief is appropriate respecting the class as a whole. The policy that class members either adhere to the HEP or pay a $25 per week fine is uniform, thereby making declaratory and injunctive relief appropriate to the Class as a whole.

146.    Certification under Rule 23(b)(3) is appropriate because Plaintiffs seek monetary damages and injunctive relief on behalf of class members and because common questions of law and fact predominate over individualized inquiries and a class action is a superior method for adjudication, as discussed further below.

**I.        Numerosity**

147.    The members of the Class are so numerous that joinder of all members is impracticable.

148.    While the exact number of class members is presently unknown, Plaintiff estimates that there may be as many as 35,000-40,000 class members. The exact number of class members can only be ascertained through appropriate discovery.

**II.        Commonality**

149.    Plaintiffs' claims arise from the same policy and course of conduct on the part of the defendants' and Plaintiffs' claims are based on the same legal and remedial theories as those of the proposed Class and involve similar factual circumstances.

150.    Further, the injuries suffered by Plaintiffs are similar to the injuries suffered by class members, and Plaintiffs seek common forms of relief for themselves and members of the Class, including injunctive and declaratory relief, lost wages, and non-economic damages.

151.    Plaintiffs have standing to bring this suit on behalf of putative class members). in particular:

    a.  Many of the class members would have standing to sue in their own right because they were and continue to be adversely affected by the actions of the class defendants.  These members face imminent harm flowing directly from the actions and rules because the rules and actions of the defendants have and continue to cause them harm to incur significant financial penalties or divulge ADA and GINA-protected health and genetic information when they do not wish to do so.  That information, once revealed, will never be confidential again.

    b.  The class members, whom are all employees of the City of Chicago, and members of the above names unions who contracted for the Wellness Programs with the City of Chicago, have been penalized for non-participation in what is being called a "voluntary" program that invades their privacy and is against federal law.

    c.  The interests that the GLENN  WILLIAMS as a representative of the plaintiff class members is to protects from discrimination in employment and protest the employees financial security, health, well-being and civil rights.

    d.  Either the claims asserted not the relief requested requires individual plaintiffs' or City employees to participate in the lawsuit.

**Class Allegations Federal Rules of Civil Procedure 23**

**Plaintiffs Case:**

152.   This action is predicated upon the facts that the class of plaintiffs and the individual classes of   defendants as defined herein are:

    a.   So numerous that joiner of all members is impractical

    b.   There are questions of law and are common to the alleged classes

    c.   The claims of the representative parties are typical of the claims and defenses of the named class representatives

    d.   The representative parties will adequately protect the interest of the class

153.   The questions of law and fact are common to class members predominate over any questions   affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

154.   The matters pertinent to these allegations include the following:

    a.   The named plaintiffs all belong to the largest local union associated with the City of Chicago;

    b.   This litigation has already begun by the plaintiff against the alleged defendants including the filing of an individual and class charge of discrimination and other charges with the equal employment commission of the United States which has been certified by the U.S. representative of justice as having the right to sue. See exhibits.

155.     All of the related claims raised by the complainant are directly related to the facts critical to the rights claim. Therefor it is judicially efficient for the court and parties to be before the same forum.

156.     Finally, the plaintiff class together with the defendants, both individual and class, are well within this court's manageability.

### PLAINTIFFS' STANDING

157.     Plaintiffs have alleged that Mr. Michael Malone should be certified as the defendant class representative of all the "Local Unions detected offices and Trustees" of each of the union locals and in the Collected Bargaining Negotiations in 2007-2008, 20017-2018 and who in the participating or are continuing to participate in the operation and or management of the enterprise as alleged support because the actual names of such are unknown to him. Secondly, the class is so large that for purposes of the management of this litigation having a defendant class of the group who have identical interests in the facts, applicable law and relief will considerably aid the court and parties in the management of this litigation. Should any of the current management of the union locals herein referred to as represented by the designated defendant class representative seek to have their own individual representation herein, the plaintiff, subject to this court's consideration of the request, will have no objection.

158.     This alleged defendant class includes the alleged participating plaintiff class who were un-unionized City of Chicago Employees at the time of that their but who were of legal Representative(s) who participated in the 20007-2008 and/or the 2017-2018 City of Chicago joint Collective Bargaining Agreements of the Coalition of Unionized Public Employees during

2007-2008 (COUPE), named herein as Jamey Doe and Scott Doe and who subsequently have become members of a part-time class a defined *supra.*

159.    Defendants Peter Does and Bart Does, are the alleged to be defendants who represented the coalition of Un-unionized Public Employees at the 2007-2008 and 2017-2018 Collective Bargaining sessions between the City and its employees local unions and un-unionized Collective Bargaining sessions resulting in agreement to which un-unionized employees were party thereto by virtue of their representation by the individuals comprising the "LMCC", the Labor Management Cooperative Committee during the entire relevant period and ongoing.

## PLAINTIFFS ALLEGED CLASS DEFINITIONS

### Discrimination Class Plaintiffs

160.    BROGWLEY RUSSELL and MICHELLE RUSSELL, individually and on behalf of all putative class plaintiffs respectively define the class and subclasses they seek to represent include:

> a.  All employees of the City of Chicago and their spouses or legally recognized domestic partners who as insured under the City of Chicago Hospitalization and Healthcare employees Health benefit Programs in each of the year 2012 up to and including 2020.  As such, enrollees are automatically without their consent considered by the City of Chicago and its then partners, joint ventures and codefendant as a date certain in 2012, informed that they were considered enrollees in the Chicago Lives Healthy Wellnews program

(CLHWP). They were threatened in writing by the defendants that if they did not complete the biometric screening test by a date certain. Initially they were informed that the enrolled test was to be mandatory for all employees every three by dates certain and if such was not completed by the date they were informed of they would each be penalized and fined $25.00 per paycheck, bi weekly ($50.00 per month, $600 per year per person). Said funds are deducted from the City employed partners biweekly paychecks. All persons in the class involuntariiy completed sll required tests if the CLWHP each and every years since. The did so because of the threats of monetary penalties, their fear of losing employments status and/or health benefits.

### The Non-employee Discrimination Sub-Class

161.   This class consists of all new employees of the City who is contractual relationship with a third party, Illinois Blue Cross Blue Shield and the members of this class were intentionally interfered with causing individual injuries.

### The Penalty Class

162.  Glenn Williams failed to complete the involuntary imposed biometric screening test which he attempted to complete in 2015. At some point thereafter has suffered the unauthorized biweekly deduction of $25.00 from his paycheck. This class is defined as all persons who have been involuntarily placed in CLHWP and involuntarily informed that they would be penalized by the biweekly deduction of $25.00 for each required test that was not timely completed and ho had the fines unilaterally deducted from the amounts of his paycheck.

**The Invasion of Privacy Class**

163.   Thus putative class is defined as consisting of all involuntary required City of Chicago Employees and their nonemployed spouses or legal domestic partners who's Protected Health Information was illegally converted by the defendants to their use and benefit and great profit.at the expense and loss of their illegally Protected Medical Information and thereby.

**Victims of Violations of Fiduciary Duties**

164.   All named plaintiffs who are members of organized and regulated of union locals and or un-unionized organizations who are owed fiduciary duties by the elected or appointed representatives in their dealings concerning their employment benefits for themselves and/or their family but instead suffered injury and damages by the negligent and intentional breach of their fiduciary duties.

**Restitution Class Plaintiff**

165.   All named plaintiffs and putative class plaintiffs who have been damaged by the wrongful conduct of one or more of the defendants who have caused the wrongful collection, sharing, sale leasing distribution, repackaging or bundling of their personal protected medical information and for the wrongful collection of protected non-personal information from any class member from July 2, 2012 to the present which wrongful activity the defendants have realized income.

166.   Plaintiff also request that Mr. Glenn Williams be certified as the named representative plaintiff of this class as well as putative plaintiffs.  Plaintiffs also request that

plaintiff Mr. Glenn Williams be certified s the class representative of all the other plaintiff classes that he is representative.

167.    Plaintiffs request for certification of defendant class defined as: All elected union local officers and trustees of the 54 or whatever number there are of local unions representing City of Chicago union members, the Plaintiff putative class of the same, who were actively employed in the promotion, planning directing or operations of the CLHWP from April 2012 to the present time including labor designated member of the LMCC during that period of time

**Plaintiffs' Proposed Defendant Class of Union Local Elected Officers and Trustees Including the Designated Members of the Labor Management Committee of Chicago from 2007 to 2018**

168.    Plaintiffs respectfully replead all well pleaded paragraphs of this complaint and incorporate them in this proposed certification of a defendant class defined as: "All duly elected officers and trustees of the employees of the city of Chicago and active members of the same union local in 2007, or at anytime after July 1, 2012 through June 30, 2017 or thereafter, the designated members of the LMCC from 2012 to the present time.

169.    Plaintiffs respectfully request Mr. Ramon Williams, the current president of Teamsters Local 700, the local union with the largest number of its members representative in the employee force of the City be certified as the defendant class and that Ramon Williams be certified representative class representative of such class.

WHEREFORE, Plaintiffs, individually and on behalf of the putative class, respectfully request that the Court certify this case as a plaintiffs and defendants class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and for such other relief as this Court may

consider just and owing in the circumstances including the award of compensatory damages, statutory damages, restitution, temporary and permanent injunctive relief as mandatory against the defendants from continuing their illegal conduct, plaintiffs' attorneys fees and costs and such other relief as the Court may deem appropriate.

PLAINTIFFS DEMAND A TRIAL BY JURY.

Respectfully submitted,

/s/ Allison K. Muth

_____

ALLISON K. MUTH
LAW OFFICE OF HOLSTEIN AND MUTH
130 N. Garland Court
Suite 1906
Chicago, IL 60602
(312) 906-8000
allison.muth.law@gmal.com
ARDC No. 6318105